Larry W. Lee (SBN 228175)
lwlee@diversitylaw.com
Kwanporn "Mai" Tulyathan (SBN 316704)
ktulyathan@diversitylaw.com
Kym Kanenaka (State Bar No. 350890)
kym@diversitylaw.com
**DIVERSITY LAW GROUP, P.C.**
515 S. Figueroa St., Suite 1250
Los Angeles, California 90071
(213) 488-6555
(213) 488-6554 facsimile

Renia Zadourian (SBN 331252)
renia@rzemploymentlaw.com
**LAW OFFICE OF RENIA ZADOURIAN**
1968 S. Coast Highway, Suite 3727
Laguna Beach, California 92651
(310) 708-4404

Attorneys for Plaintiff Daniel Stein

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANIEL STEIN, as an individual and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>TRANSDEV ALTERNATIVE SERVICES, INC., a Delaware corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 2:25-cv-05236-MWC-MAR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO ALTER OR AMEND JUDGMENT UNDER FED. R. CIV. P. 59(e)**<br><br>Date: December 18, 2026<br>Time: 1:30 pm<br>Courtroom: 6A, 6th Floor<br><br>Complaint Filed: May 1, 2025<br>Removal Filed: June 9, 2025 |

# TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 6

II. RELEVANT BACKGROUND .......... 7

III. LEGAL STANDARD .......... 9

IV. ARGUMENT .......... 10

A. TAS' Motion Improperly Uses Rule 59(e) to Relitigate Issues Already Decided .......... 10

B. The Record Contains Sufficient Evidence of TAS' Financial Condition .......... 10

1. The Record Contains Meaningful Evidence of TAS' Financial Condition .......... 10

2. TAS' Authorities Are Distinguishable .......... 11

3. Any Gap in TAS-Specific Financial Evidence Is Attributable to TAS .......... 12

4. Plaintiff Did Not Seek to Pierce the Corporate Veil .......... 13

5. The Court Already Resolved TAS' Foundation Objection .......... 14

C. The Punitive Award Is Not Unconstitutionally Excessive .......... 14

1. TAS' Conduct Was Highly Reprehensible .......... 15

a. TAS' Conduct Evinced Indifference to Health and Safety .......... 15

b. TAS Acted with Intentional Malice and Deceit .......... 16

c. Plaintiff Was Financially Vulnerable .......... 18

d. TAS' Contrary Arguments Repeat Its Trial Defense .......... 19

2. The Ratio Must Be Assessed in Light of the Modest Compensatory Award and TAS' Resources .......... 21

3. Comparable Civil Penalties Do Not Cap the Award .......... 22

4. TAS' Authorities Do Not Support a Lower Reprehensibility Finding or a One-to-One Limit .......... 23

D. The Court Should Not Strike the Jury's Economic Damages Award .......... 25

**1. TAS Is Relitigating Its Denied Motion in Limine and Never Made the Trial Objections the Court Required........ 25**

**2. Plaintiff Disclosed Every Input Used to Calculate His Lost Earnings... 26**

**3. Any Disclosure Deficiency Was Harmless ........ 27**

**V. CONCLUSION........ 28**

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arteaga v. Asset Acceptance*, 733 F. Supp. 2d 1218, 1236 (E.D. Cal. 2010)............... 9

*Bains LLC v. Arco Prods. Co.*, 405 F.3d 764 (9th Cir. 2005) .................................... 23

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 575, 580–83 (1996) ..................... 15

*Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003)............................................... 9

*Diaz v. Tesla, Inc.*, 697 F. Supp. 3d 906, 934–35 (N.D. Cal. 2023)......... 20, 21, 22, 23

*Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ...................................... 9

*Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1136 (C.D. Cal. 2015) . 13

*Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175 (9th Cir. 2008) ............... 28

*Kaffaga v. Estate of Steinbeck*, 938 F.3d 1006, 1018–1019 (9th Cir. 2019)............. 11

*Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)...................... 9

*Levi Sap Nei Thang Victims Ass'n v. Levi Sap Nei Than*, No. 2:23-cv-04210-HDV-JPRx, 2025 WL 3190859 (C.D. Cal. Oct. 17, 2025) ............................................. 12

*Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1192 (9th Cir. 2022) .......................... 27

*Martinez v. Costco Wholesale Corp.*, No. 19-CV-1195-WVG, 2023 WL 1931836, at *23–24 (S.D. Cal. Feb. 10, 2023) ........................................................................... 11

*McCray v. Westrock Servs., LLC*, No. CV 21-9853-DMG (RAOx), 2024 WL 4579108, at *9–10 (C.D. Cal. Sept. 10, 2024)....................................................... 23

*McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999)................................ 9

*Mitri v. Walgreen Co.*, 660 F. App'x 528, 530–31 (9th Cir. 2016)............................ 22

*mophie, Inc. v. Shah*, No. SA CV 13-1321 (JEMx), 2015 WL 13917980 (C.D. Cal. Dec. 11, 2015) ............................................................................................... 11, 12

*Nikmanesh v. Wal-Mart Stores, Inc.*, No. SACV 15-202 JGB (JCGx), 2022 WL 1837515, at *11 (C.D. Cal. Feb. 25, 2022)............................................... 24, 25

*Samson v. Wells Fargo Bank*, N.A., 2022 WL 23090556, at *3, *6 (C.D. Cal. Dec. 16, 2022) ........ 25
*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)........ 15, 20, 21
*Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003).......... 9
*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) 27
*Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001) ........ 9

**State Cases**

*Baxter v. Peterson*, 150 Cal. App. 4th 673, 680–681 (2007) ........ 11
*Colucci v. T-Mobile USA, Inc.*, 48 Cal. App. 5th 442, 457–458 (2020) ........ 23, 25
*Farmers & Merchants Trust Co. v. Vanetik*, 33 Cal. App. 5th 638 (2019)........ 11
*Fernandes v. Singh*, 16 Cal. App. 5th 932, 942 (2017) ........ 13
*Gober v. Ralphs Grocery Co.*, 137 Cal. App. 4th 204, 222–223 (2006)........ 24, 25
*Roby v. McKesson Corp.*, 47 Cal. 4th 686, 715–718 (2009) ........ 23, 24
*Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1282–1283 (1994) ...... 11

**Statutes**

Labor Code section 1102.5(f) ........ 22

**Rules**

Fed. R. Civ. P. 37(c)(1)........ 27
Rule 26(f) ........ 27
Rule 37(c)(1) ........ 6, 25, 27
Rule 50(a)........ 10
Rule 50(b)........ 6
Rule 59(e)........ passim

## I. INTRODUCTION

Defendant Transdev Alternative Services, Inc. ("TAS") asks the Court to use Rule 59(e) to rewrite the jury's verdict from top to bottom: to eliminate the $10,000,000 punitive award, or alternatively to reduce the award to a mere $50,000, and to strike the jury's $210,080 award of past and future lost earnings. TAS asks the Court to leave Plaintiff with $50,000 in compensatory damages and, if punitive damages survive at all, to cap them at the remaining compensatory award. None of TAS' requests satisfies the demanding Rule 59(e) standard.

TAS' first argument, that the record lacks evidence of TAS' financial condition, duplicates its renewed Rule 50(b) motion and repeats the very same arguments the Court already rejected when it denied TAS' Rule 50(a) motion that TAS made during the trial itself. Its second argument, that the award is constitutionally excessive, rests on a sanitized account of TAS' conduct that the jury rejected when it found that TAS' managing agents acted with malice, oppression, or fraud in firing a 70+-year-old employee for reporting a workplace safety issue – the dangerous street takeover. Its third argument, that Plaintiff's lost-earnings award should be stricken under Rule 37(c)(1), merely renews a motion in limine the Court denied, while ignoring the Court's instruction that TAS object to specific evidence at trial. The motion should be summarily denied in its entirety.

As a side note, TAS continues to fail to comply with Court's Standing Order as to the use of Artificial Intelligence ("AI"). As noted in Plaintiff's November 16, 2026 filing in response to TAS' objections to Plaintiff's Application to Tax Costs, Defendant's counsel, Allison Scott's, declaration completely fails to identify which "portion of the" brief incorporates generative AI outputs. Despite Plaintiff putting Defendant on notice of that deficiency, Ms. Scott again fails to comply with the Court's Standing Order and identify which portion of the brief incorporated generative AI outputs. As such, TAS' motion here should be stricken.

## II. RELEVANT BACKGROUND

This case has been tried to two juries. The first jury trial began on August 17, 2026. On August 20, 2026, both sides rested, and the Court denied the parties' cross-Rule 50 motions for judgment as a matter of law. Dkt. 122. After the jury deliberated for approximately one and a half days without reaching a verdict, the Court declared a mistrial and set the case for retrial on September 8, 2026. Dkt. 158. Before the re-trial, Plaintiff asked whether TAS would agree to proceed by bench trial and TAS responded that it "respectfully declines to waive its right to a jury trial." Declaration of Larry W. Lee ("Lee Decl.") ¶ 2, Ex. A. At the close of evidence in the second trial, TAS again moved under Rule 50. First, while the jury was deliberating the liability phase, TAS moved to have liability declared in their favor. Then, after the jury found liability in Plaintiff's favor, and while the jury was deliberating the punitive damages, TAS moved yet again for a Rule 50 motion as to the punitive damages. Needless to say, the Court denied both of TAS' motions for judgment as a matter of law. Dkts. 173 & 190.

As the Court will recall, the second trial proceeded in two phases from September 8 through September 11, 2026: Phase I addressed liability, compensatory damages, and entitlement to punitive damages, and Phase II addressed the amount of punitive damages. Dkt. 204 at 1–2. The jury found for Plaintiff on ***every*** claim submitted and found that TAS failed to prove by clear and convincing evidence that it would have terminated Plaintiff anyway for legitimate, independent reasons. Dkt. 186 at 3. The jury awarded $73,040 in past lost earnings, $137,040 in future lost earnings, $50,000 in past noneconomic damages. *Id*. at 7. The jury then found that one or more of TAS' officers, directors, or managing agents acted with malice, oppression, or fraud. *Id*. at 8. In Phase II, the jury unanimously awarded $10,000,000 in punitive damages. Dkt. 187 at 2. Upon Plaintiff's submission of the proposed Judgment, TAS filed a lengthy objection to the proposed Judgment, making the same arguments it

does here in this Motion. Dkt. 200. Despite such objections, the Court entered judgment for the entire $10,260,080 on October 23, 2026. Dkt. 204 at 8.

The evidence at trial showed that TAS' GPS routing sent Plaintiff and his co-driver into a street takeover in downtown Los Angeles, that Plaintiff reported the situation to his supervisor using his work phone, and that TAS then terminated him for that very phone use. Plaintiff's supervisor, Athena Wong, responded to the report at 12:46 a.m.: "Copy, I'll see if I can get a DZ put in the area. Keep me updated." The parties stipulated that "DZ" stands for disengagement zone. Dkt. 103 ¶ 15. Ms. Wong also told Plaintiff to "be safe" along with a prayer emoji. *Id*. at ¶ 18. Plaintiff's partner, Adam Gardener, also submitted a lengthy report to TAS describing the harrowing and dangerous situation he and Plaintiff were caught in, which included a police blockade and him feeling "extremely nervous and unsafe." *See* Trial Exhibit 13. Indeed, during his trial testimony, Mr. Gardener also testified the same, and further added that he was scared that they could get hurt as he was worried people around them would have firearms and that he and Plaintiff could be "carjacked." *See* Lee Decl. ¶ 3, Ex. B at 155:25–156:19.[1] On top of such clearly written statements, TAS' own vehicle which Plaintiff was driving that night also recorded everything that happened around the vehicle that night, which showed mobs of people rioting in the streets, fireworks in the sky and police right next to Plaintiff's vehicle. *See* Trial Exhibit 11. In addition, even CBS news reported this street takeover live on TV with helicopter footage showing the exact dangerous situation Plaintiff was caught in. *See* Trial Exhibit 19.

Yet the manager who recommended Plaintiff's termination, Cynthia Lopez, testified that she **never even considered, despite all such evidence,** that Plaintiff and Mr. Gardener faced the remote possibility of an emergency or were stuck in a

[1] Relevant portions of the trial transcript for each day of the second jury trial cited in this Opposition are attached as Exhibits A through D to the concurrently filed Declaration of Larry Lee.

dangerous situation that night. *See* Lee Decl. ¶ 4, Ex. C at 130:10–135:8; 164:2–166:1. Indeed, even up through the time of trial and upon further reflection of all the evidence presented to her at trial, Ms. Lopez continued to take the position that Plaintiff and Mr. Gardener were never in a dangerous or emergency situation! *Id.*

As further discussed below, this type of corporate attitude is exactly why the jury awarded the punitive damages, and which is why the punitive damages amount is appropriate,

## III. LEGAL STANDARD

"Although Rule 59(e) permits a district court to reconsider and amend a previous [judgment], the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citation modified). "[A] motion for reconsideration [under Rule 59(e)] should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence," clear error, an intervening change in controlling law, or manifest injustice. *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003); *Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003).

A motion to alter or amend a judgment "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008); *Kona*, 229 F.3d at 890. Therefore, a court may disregard "repeated legal arguments" and "facts that were available earlier in the proceedings." *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). A district court has considerable discretion when considering a motion to amend a judgment under Rule 59(e). *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999); *Arteaga v. Asset Acceptance*, 733 F. Supp. 2d 1218, 1236 (E.D. Cal. 2010).

//

# IV. ARGUMENT

## A. TAS' Motion Improperly Uses Rule 59(e) to Relitigate Issues Already Decided

TAS identifies no newly discovered evidence and no intervening change in controlling law. Instead, each of its three arguments repeats the same arguments that TAS has already presented to this Court and which the Court has already considered and rejected. The Court denied TAS' Rule 50(a) motion on financial condition, finding that, even apart from Exhibit 35, "…there was ample information that was introduced in phase one ... to give the jury ... a ballpark sense of the financial condition of Transdev Alternative Services specifically." Scott Decl., Ex. A at 114:22–115:2. The Court also denied TAS' motion in limine seeking exclusion of Plaintiff's damages evidence, without prejudice to TAS objecting to specific evidence at trial. The jury then determined how much punishment TAS' conduct warranted, applying an instruction **to which TAS agreed**. TAS has not identified any manifest legal or factual error in the judgment; it simply seeks to re-argue issues the jury and the Court have already resolved.

## B. The Record Contains Sufficient Evidence of TAS' Financial Condition

TAS' argument that the record contains no meaningful evidence of its financial condition fails on the evidence, on the law, and on the record of TAS' own conduct. The jury heard meaningful evidence of TAS' financial condition; TAS' doctrinal objections to that evidence lack merit; and any remaining gap in TAS-specific figures exists because TAS did not supply them.

### 1. The Record Contains Meaningful Evidence of TAS' Financial Condition

California law does not require a particular form of financial evidence. Net worth is not the exclusive measure for punitive damages; other financial evidence

may be relevant where it provides a meaningful picture of ability to pay, and there is "no rigid formula" for determining financial condition. *Farmers & Merchants Trust Co. v. Vanetik*, 33 Cal. App. 5th 638 (2019).

The record contained that meaningful picture. As the Court found, there was testimony concerning the number of employees, the rate of pay, an across-the-board increase in the rate of pay, and other assets including the vehicles that follow the Waymos, all of which the jury could rely on to get a sense of TAS' financial condition. Scott Decl., Ex. A at 115:2–10. The jury also heard from TAS' own witness that TAS is 100 percent owned and controlled by Transdev Group, which generated consolidated revenue of €10,444.4 million in 2025, which is the equivalent of over $11.4 **billion** US dollars, and that TAS falls within the United States revenue segment, which accounted for 27.5 percent of that revenue. Lee Decl. ¶ 5, Ex. D at 86:8–13, 86:20–87:1; Scott Decl., Ex. A at 87:15–18, 89:10–23.

**2. TAS' Authorities Are Distinguishable**

None of TAS' authorities involved a record like this one. As TAS describes them, *Baxter* and *Farmers* reversed awards against individual defendants where the plaintiff offered assets without liabilities, or income without expenses. *Baxter v. Peterson*, 150 Cal. App. 4th 673, 680–681 (2007); *Farmers*, 33 Cal. App. 5th at 648–650. In *Tomaselli*, the parent's annual report contained no separate information concerning the defendant insurer, one of many subsidiaries. *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1282–1283 (1994). In *Kaffaga*, the court vacated an award because the plaintiff did not present "meaningful evidence" of the defendant's financial condition and ability to pay. *Kaffaga v. Estate of Steinbeck*, 938 F.3d 1006, 1018–1019 (9th Cir. 2019). *Martinez* vacated an award where the plaintiff neglected financial-condition discovery and "presented no evidence of Defendant's financial condition at trial." *Martinez v. Costco Wholesale Corp.*, No. 19-CV-1195-WVG, 2023 WL 1931836, at *23–24 (S.D. Cal. Feb. 10, 2023). *mophie*

and *Levi Sap Nei Thang*, as TAS describes them, struck awards for lack of evidence of the defendants' financial condition or ability to pay. *See mophie, Inc. v. Shah*, No. SA CV 13-1321 (JEMx), 2015 WL 13917980 (C.D. Cal. Dec. 11, 2015); *Levi Sap Nei Thang Victims Ass'n v. Levi Sap Nei Than*, No. 2:23-cv-04210-HDV-JPRx, 2025 WL 3190859 (C.D. Cal. Oct. 17, 2025); Dkt. 214-1 at 10.

Here, by contrast, the jury heard directly about TAS' workforce, pay rates, and fleet, and the admitted pages of Trial Exhibit 35, Transdev Group's 2025 consolidated financial report (the "Report"), presented the group's revenue and net income, identified TAS within the scope of consolidation, and identified the United States segment as 27.5 percent of the group's revenue. Scott Decl., Ex. A at 87:18–25, 89:10–23, 90:1–7; see Dkt. 213-1 at 22. Trial Exhibit 23, TAS' employee handbook, links those figures to TAS by identifying Transdev Alternative Services as the Transdev North America business unit managing driver recruitment, development, and operations for the self-driving car industry. Scott Decl., Ex. G at 6, TAS000223. As this Court has already found, such evidence clearly provides the jury with a ballpark sense of TAS' financial condition.

**3. Any Gap in TAS-Specific Financial Evidence Is Attributable to TAS**

To the extent the record lacks TAS-only financial statements, that gap is attributable to TAS. The Court told TAS that "[t]his is federal court" and that TAS had "an obligation to affirmatively turn this information over." Scott Decl., Ex. A at 78:8–13. It then told TAS: "I'm saying I ordered you to do it, and you didn't do it." Scott Decl., Ex. A at 83:2–4. The Court found that TAS was "supposed to designate somebody that was going to be able to testify about financial condition," yet TAS produced a witness who had no such information. *Id*. at 84:14–17. Even TAS' own discussion of *Farmers* acknowledges that the analysis differs for "defendants who ignored an order to produce financial records." Dkt. 214-1 at 18 (citing *Farmers*, 33

Cal. App. 5th at 651–652). California law is no different: "[a] defendant is in the best position to know his or her financial condition, and cannot avoid a punitive damage award by failing to cooperate with discovery orders," and "noncompliance with a court order to disclose financial condition precludes a defendant from challenging the sufficiency of the evidence of a punitive damages award on appeal." *Fernandes v. Singh*, 16 Cal. App. 5th 932, 942 (2017) (citation omitted).

TAS' contention that the Court's directives concerned only Walsh's attendance cannot be squared with the Court's own description of them. On August 25, the Court required Walsh to attend unless the parties stipulated to TAS' financial condition, calling him "the witness that's been identified to testify about issues that are related to punitive damages"; TAS responded only that Walsh had not been designated on financial condition, and it produced no other witness and no TAS-specific records. Scott Decl., Ex. F at 44:5–45:9. Walsh then testified that he had never seen the Report before trial and had no information about TAS' or Transdev North America's financial condition. Scott Decl., Ex. A at 91:8–18, 93:22–94:2. Plaintiff disclosed on July 10 that he would use "Defendant's financial condition evidence, specifically Defendant's 2025 financial report." Dkt. 62 at 15, § II.C.2.m. And although TAS itself moved for the bifurcation the Court granted on August 6, Dkt. 102 at 7–9, it never produced TAS-specific financial documents, nor any witness to dispute the financial report. TAS cannot rely on a gap its own litigation choices created.

### 4. Plaintiff Did Not Seek to Pierce the Corporate Veil

TAS next argues that Plaintiff could not rely on Transdev Group's finances without piercing the corporate veil. Plaintiff did no such thing. TAS' reliance on the unity-of-interest and inequitable-result requirements, *see Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1136 (C.D. Cal. 2015), conflates two distinct doctrines. Alter ego governs whether one entity may be held liable for another's obligations. Plaintiff sought no judgment against Transdev Group. Plaintiff offered

the Report, in which TAS is expressly identified, as circumstantial evidence of the resources available to a wholly integrated subsidiary that produced no separate financial statements of its own. Plaintiff's counsel's attribution of the 27.5 percent United States revenue figure to the segment in which TAS operates was argument from admitted evidence, not a veil-piercing theory, and the weight of that inference was for the jury.

#### 5. The Court Already Resolved TAS' Foundation Objection

TAS' foundation challenge to the Report is also an improper attempt to relitigate a settled evidentiary ruling. The Court denied TAS' motion in limine to exclude the Report, found TAS' challenge to Plaintiff's ability to lay foundation premature, and permitted TAS to address the Report's lack of TAS-specific information through evidence or argument at trial. Dkt. 102 at 12–14, § III.D. The Court then admitted only pages 86 and 12 of the financial report. Scott Decl., Ex. A at 87:18–25, 90:1–7. Rule 59(e) is not a vehicle to reargue those rulings. Nor can TAS fault Plaintiff for Walsh's inability to lay foundation. TAS produced Walsh as its Rule 30(b)(6) witness and the witness the Court identified for punitive-damages issues yet did not prepare him to address any financial matter. A party that offers a witness with no financial knowledge cannot then argue post-trial that the opponent failed to lay foundation through that witness. Nor did TAS offer to provide a different witness to dispute the financial figures in the report or any other financial issue. Moreover, the Court has already found that the Report, a publicly issued consolidated financial report of TAS' ultimate parent, "contains sufficient guarantees of trustworthiness that it may be admissible under the residual exception to the hearsay rule." Dkt. 102 at 13 (citing Fed. R. Evid. 807).

### C. The Punitive Award Is Not Unconstitutionally Excessive

Whether an award of punitive damages exceeds the bounds of due process is determined on a case-by-case basis by examining: (1) the reprehensibility of the

conduct being punished; (2) the ratio of the punitive damages award to the compensatory damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 575, 580–83 (1996). ***The degree of reprehensibility of the conduct at issue is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award***." *Id*. at 575 (emphasis added).

### 1. TAS' Conduct Was Highly Reprehensible

The reprehensibility factors include whether the harm was physical rather than economic, ***whether the conduct evinced an indifference to or reckless disregard of the health or safety of others***, ***whether the plaintiff was financially vulnerable***, whether the conduct involved repeated actions, and whether the harm resulted from intentional malice, trickery, or deceit. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (emphasis added). Several of these factors are present here, and they weigh heavily against Defendant.

#### a. TAS' Conduct Evinced Indifference to Health and Safety

This case is, at its core, about employee and workplace safety. It is undisputed that TAS fired Plaintiff because he reported that he and his co-driver were trapped in a dangerous street takeover. The jury found that Plaintiff disclosed to a TAS employee with authority to investigate violations of public safety standards, California traffic laws, and occupational safety regulations. The jury also found that TAS discharged Plaintiff for refusing to perform work in violation of an occupational safety or health standard where the violation would create a real and apparent hazard to Plaintiff or his fellow employees. An employer that punishes an employee for reporting a threat to his/her's or other co-workers' physical safety sends a message to every other employee that reporting safety issues will cost them their jobs, and that they should just risk their own safety if they want to work. That is the very definition

of conduct evincing indifference to the health and safety of others. TAS' attempt to reframe its Mobile Device Policy as a safety measure only underscores the point: the jury found that TAS used that policy to punish a safety report.

**b. TAS Acted with Intentional Malice and Deceit**

The jury found that TAS' managing agents acted with malice, oppression, or fraud, and that TAS' stated reason for the termination did not establish that it would have fired Plaintiff anyway. The evidence itself confirms that TAS was not interested in what actually happened or care about Plaintiff and Mr. Gardener's safety at all. Ms. Lopez admitted that the policy violation consisted of the very texts Plaintiff exchanged with his supervisor that night, yet she claims she never reviewed them as part of her investigation. Lee Decl. ¶ 4, Ex. C at 114:17–24. She did not interview Plaintiff, his partner Adam Gardener, or Athena Wong, and she even testified that she did not think she should have spoken with all relevant witnesses before recommending termination. *Id*. at 115:8–16, 121:2–4. Instead, she copied her recommendation almost word for word from the supervisor's record of discussion, which, instead of acknowledging the street takeover, downplayed the situation and described as a "car meet," and added nothing about the street takeover, the police, or Mr. Gardener's account, even though she had read both drivers' statements. *Id*. at 116:17–117:10, 119:1–4. The record of discussion was itself incomplete: supervisor Eric Flores, who prepared it, admitted that Plaintiff told him he was trapped in a street takeover with police present and was escalating the situation, yet none of that appears in the write-up. Lee Decl. ¶ 3, Ex. B at 261:2–10, 263:4–21, 269:9–21.

But it was Ms. Lopez's fantastical trial testimony that truly gave the jury ample reason to conclude that her account was purposefully concocted to deflect and deny that Plaintiff was reporting a safety issue. As shown above, Ms. Lopez purposefully buried her head in the sand when she refused to acknowledge even the remote possibility that Plaintiff was in danger when presented with all the undisputed

evidence. For example, when asked why nothing from the in-vehicle video suggested an emergency, and despite the street takeover happening at midnight, she ludicrously answered: "Because it's LA traffic. You see a lot of stop and go." Lee Decl. ¶ 4, Ex. C at 152:4–11. On redirect, she conceded that, apart from the takeover itself, traffic in the video was "free-flowing," and that a street takeover with people doing donuts, fireworks, helicopters overhead, and people running in the streets is "not necessarily" L.A. traffic. *Id*. at 163:1–11. She then testified that each detail in Adam Gardner's written statement, describing "crazy driving," fireworks, people "exiting their vehicles and running around the street," a scene that was "very chaotic," and his feeling "extremely nervous and unsafe," did not tip her off to even the possibility of an emergency. *Id*. at 164:2–15.

So either Ms. Lopez was completely lying in order to deflect the dangerous situation that Plaintiff was trapped in, or she, as TAS' managing agent, simply didn't care about TAS' employees' safety. Either way, the jury was entitled to find that such testimony was either deceitful or evinced indifference to Plaintiff's safety.

Notably, Ms. Lopez's testimony about the sexual-harassment hypothetical further confirmed that TAS enforces its policies without regard to the protected nature of the communication. Presented with a driver trapped in the same street takeover who was being sexually harassed by her co-worker, Lopez first testified that the driver should contact only the police and not her supervisor or anyone at TAS. Lee Decl. ¶ 4, Ex. C at 110:4–18. When confronted with TAS' own sexual harassment policy, she conceded that her testimony was not consistent with the policy. *Id*. at 112:8–15. Nonetheless, in toeing TAS' line, she then confirmed her prior testimony that a driver who reached out to a supervisor in that situation to complain about sexual harassment would also be subject to termination under the Mobile Device Policy, and agreed: "So while she could reach out to a supervisor during a situation she would still be fired, correct?" "If that's what the investigation

finds, yes, that's correct." *Id*. at 113:3–12. That testimony, from the manager responsible for investigating Mobile Device Policy violations and recommending terminations, shows a corporate practice of punishing employees for the very act of reporting, whether the report concerns a physical threat or unlawful sexual harassment. It also undermines TAS' claim that its policy reflects a benign safety purpose: a policy that, as applied by TAS' own manager, would terminate an employee for reporting sexual harassment in real time is not a safety measure but a mechanism for silencing complaints.

To further cement the reprehensible nature of TAS' conduct, Ms. Lopez also added an unverified and irrelevant accusation to her termination recommendation. Her final recommendation also accused Plaintiff of exiting the vehicle "to smoke," yet she admitted at trial that she was "never able to confirm that he was smoking," that she was "adding an allegation that [she] couldn't even confirm," and that she nonetheless submitted a termination recommendation "based upon at least one unconfirmed allegation." Lee Decl. ¶ 4, Ex. C at 118:3–25, 119:8–15. Lopez further testified that she never asked Plaintiff whether he had been smoking. *Id*. at 166:22–23. Padding a termination recommendation with an irrelevant accusation the investigator could not even substantiate is further evidence that there was malice and deceit. Clearly, all of this was evidence presented to the jury, and as a result, the $10 million was the jury's message of how reprehensible it found TAS' conduct to be.

**c. Plaintiff Was Financially Vulnerable**

As the evidence showed, Plaintiff was an hourly employee earning approximately $33 per hour. He was 70+ years old at the time of the street takeover and survived off of his social security benefits and savings. Lee Decl. ¶ 3, Ex. B at 56:18–20. TAS terminated him within days of his report, and his post-termination notary income was substantially less than the wages he had earned at TAS. An older, hourly worker who loses his job for reporting a safety hazard is precisely the kind of

financially vulnerable target the reprehensibility analysis is meant to protect.

**d. TAS' Contrary Arguments Repeat Its Trial Defense**

TAS emphasizes the safety purpose of its Mobile Device Policy, its enforcement of the policy against other employees, and the fact that it did not discipline Plaintiff's partner. However, the jury heard all of that evidence and rejected TAS' position that the policy, rather than retaliation, explained the termination. TAS' reliance on its "zero tolerance" enforcement cuts the other way: TAS emphasizes that Athena Wong alone estimated she participated in 10 to 15 other terminations under the same policy, and that Lopez described the rule as zero tolerance, confirming that TAS' institutional practice was to apply the policy without regard to whether an employee was using a phone to report an emergency. See Dkt. 214-1 at 23; Scott Decl., Ex. D at 225:18–226:14; Ex. E at 151:15–23. That is not isolated misconduct by a rogue supervisor; it reflects a corporate approach that subordinates employee safety reporting to rigid enforcement.

But one can also point to TAS' own written sexual harassment policy that requires someone to immediately report any such harassment to a manager or HR. See Lee Decl. ¶ 4, Ex. C at 111:9–20. Yet, as shown above, Ms. Lopez staunchly stated that an employee should report such harassment to the police and not anyone at TAS. The point is that while every employer routinely has facially legitimate policies in place, the actual practice by an employer's managing agent could very well not follow such written policies.

The remaining evidence TAS cites does not lessen the reprehensibility of what it did to Plaintiff. TAS points to Vehicle Code provisions governing handheld device use, but by TAS' own account Vehicle Code section 23123 permits drivers to use a telephone for emergency purposes, and the parties stipulated that TAS' own policy contains an exception for calls to emergency services. Scott Decl., Ex. Q. That the policy allowed calls to 911 or let a co-driver communicate with a supervisor does not

make it less retaliatory to fire the driver who actually made the safety report. *See* Scott Decl., Ex. P at TAS000341–342, §§ 5.6–5.8, 7.1. Ms. Wong's response that she would try to get a disengagement zone put in the area and that she told Plaintiff to "be safe" shows that TAS' own supervisor recognized the danger in real time, which makes Ms. Lopez's claim that an emergency never crossed her mind harder, not easier, to credit. Scott Decl., Ex. D at 207:1–10. Mr. Gardner's comfort in submitting a written statement after the fact says nothing about whether TAS punished the driver who called for help from inside the takeover. *See* Scott Decl., Ex. D at 171:14–172:6.

*Diaz v. Tesla, Inc.* confirms this analysis. There, the court denied the employer's Rule 59(e) motion to reduce a punitive award exceeding nine to one, finding that reprehensibility, the "most important indicium" of reasonableness, favored a high award *where supervisors* carried out the misconduct, the employer failed to investigate properly, and the jury "could have interpreted the evidence to show that Tesla knew what it was supposed to do and affirmatively chose to not carry out the proper responses." *Diaz v. Tesla, Inc.,* 697 F. Supp. 3d 906, 934–35 (N.D. Cal. 2023) (quoting State Farm, 538 U.S. at 419). The court rejected the employer's claim that its conduct was "merely negligent at best" because "the jury could have credited the testimony of any number of witnesses that stated otherwise," and it found reprehensibility heightened where the harm "was not merely economic" and the jury could have found a threat of physical harm. *Id.* at 935. So too here. The jury found that TAS' managing agents, not a rogue employee, acted with malice, oppression, or fraud, and it was entitled to find that TAS knew Plaintiff was reporting a threat to his and his co-driver's physical safety and fired him anyway. Again, the testimony from TAS' own managing agents, and in particular, Ms. Lopez, was either completely untruthful, or if truthful, that Ms. Lopez did not care for Plaintiff's safety whatsoever. There is nothing more reprehensible than Ms. Lopez's testimony.

//

### 2. The Ratio Must Be Assessed in Light of the Modest Compensatory Award and TAS' Resources

*State Farm* recognized that higher ratios may be justified where the injury is hard to detect, the conduct is particularly egregious, or the actual damages are small. 538 U.S. at 426. That describes this case. The compensatory award was modest: the lost wages of an hourly worker and a measured $50,000 for emotional distress, with nothing for future noneconomic loss. It was this modest because Plaintiff was 70+ years old and admitted that he had plans on retiring in the coming years. Had Plaintiff been 40 or 50 years old, his lost wages component would have likely exceeded the awarded amount by the multiples. The modesty of the award is simply the result of Plaintiff's age, which is not a factor that Plaintiff could control. Against a defendant of TAS' scale, a strict ratio would yield an award too small to deter. The jury, having heard evidence of TAS' workforce, fleet, payroll, and place within a multibillion-euro enterprise, determined that $10,000,000 was necessary to punish and deter such conduct. That determination deserves substantial deference.

*Diaz* confirms that the single-digit guidance yields where the facts warrant. The ratios are "instructive," not "binding," and their purpose is "to protect a tortfeasor's due process rights and prevent irrational or arbitrary deprivations of property." *Diaz*, 697 F. Supp. 3d at 935–36. The *Diaz* court found that purpose satisfied because the employer "received fair notice that it could be subject to a high damages award when it received ... notice of the complaints ... but failed to take corrective action," and because there had been "two trials, two juries, two sets of instructions, two occasions for every witness to testify, two opportunities for the parties to present their cases and receive a fair trial." *Id*. at 936. Both are true here. Plaintiff told TAS he was trapped in a street takeover, his co-driver's written statement corroborated the danger, and TAS reviewed the video before firing him. This case, too, was tried twice, and it was TAS that insisted on a second jury trial.

TAS declined Plaintiff's offer to have the second trial proceed as a bench trial before this Court, electing to have a jury again decide liability and punishment. See Lee Decl. ¶ 2, Ex. A. Having chosen that forum, TAS cannot now ask the Court to substitute its own judgment for the jury's.

*Diaz* also held that an employer that attacked witness credibility rather than presenting "actual, compelling evidence of implementing its supposedly strong anti-harassment policies" risked the jury viewing it as "continuing its efforts to evade responsibility." *Id*. TAS did the same, defending the termination through a manager the jury was entitled to disbelieve and offering no punitive-phase witness able to address its finances. As in *Diaz*, "[t]hat was the risk of pursuing the chosen strategies given the egregiousness of the underlying conduct." *Id*.

Finally, the proper denominator is the jury's full $260,080 compensatory award, not the $50,000 TAS proposes after eliminating the economic damages, for the reasons set forth below.

### 3. Comparable Civil Penalties Do Not Cap the Award

TAS points to the $10,000 civil penalty authorized under Labor Code section 1102.5(f). However, the civil-penalty guidepost is the least weighty of the three, and a per-violation penalty payable in addition to an employee's damages was never intended to define the outer limit of punishment for a corporate employer whose managing agents acted with malice, oppression, or fraud. The existence of an additional civil penalty confirms that the Legislature views retaliation against whistleblowers as serious misconduct warranting sanctions beyond compensation. TAS' other authorities do not hold otherwise. TAS' own parenthetical for *Mitri v. Walgreen Co.*, 660 F. App'x 528, 530–31 (9th Cir. 2016), states only that the court compared a wrongful-termination award to the section 1102.5(f) penalty, not that the penalty caps punitive damages. The disparity *State Farm* addressed, a $145 million award against a comparable civil penalty of $10,000, is of a different order of

magnitude than the award here.

Simply put, section 1102.5(f) is not a ceiling on punitive damages at all; it is a civil penalty that the Legislature made available **<u>in addition</u>** to an employee's ”other remedies.” TAS identifies no statute that limits punitive damages for retaliation of this kind.

Diaz *further* held that the defendant's wealth “may properly be considered by the jury ... so long as it is not used to make up for a dearth of other State Farm factors,” and that because the guideposts justified the award, “the jury was entitled to consider Tesla's wealth in determining the necessary amount to punish and deter its conduct.” *Diaz*, 697 F. Supp. 3d at 937 (citing *Bains*, 405 F.3d at 777). The same is true here: the jury properly considered TAS' resources only after finding conduct that satisfied the reprehensibility guidepost.

**4. TAS' Authorities Do Not Support a Lower Reprehensibility Finding or a One-to-One Limit**

TAS' authorities do not support a one-to-one limit. As TAS acknowledges, *Roby* capped punitive damages at the compensatory award only after finding the employer's reprehensibility at the low end of the range, and *Colucci* found the wrongdoing low to moderate. *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 715–718 (2009); *Colucci v. T-Mobile USA, Inc.*, 48 Cal. App. 5th 442, 457–458 (2020). Neither case involved retaliation for reporting a threat to physical safety. The jury's finding that TAS failed to show it would have fired Plaintiff anyway answers *McCray*, which weighed the employer's legitimate business reasons. *McCray v. Westrock Servs., LLC*, No. CV 21-9853-DMG (RAOx), 2024 WL 4579108, at *9–10 (C.D. Cal. Sept. 10, 2024).

Nor does *Roby's* focus on institutional responsibility help TAS, because the jury punished corporate conduct. In *Roby*, the court held that a corporation "cannot be punished for harassment merely because one of its employees has harassed another

employee." 47 Cal. 4th at 714. The court noted the inquiry turns on "the corporation's institutional responsibility." *Id*. The punishable conduct of the employer in *Roby* was therefore limited as the harassment was the work of a local supervisor of four employees in a 20,000-person company, and senior management's role was a "one-time failure" to respond. *Id.* at 714–716. Here, there was no rogue supervisor whose conduct must be imputed to TAS. The termination was itself the corporate act: Lopez, the operations manager, reviewed the video and both drivers' statements and recommended firing Plaintiff through TAS' formal termination process, and the jury found that TAS' managing agents acted with malice, oppression, or fraud. Dkt. 186 at 8. Unlike the managers in *Roby*, who "were required to enforce the policy strictly," *id*. at 716, TAS' managers were responsible for deciding whether the emergency exception applied, and Plaintiff testified that he "exercised the emergency provision of the mobile device policy." Lee Decl. ¶ 3, Ex. B at 110:20–23. Yet Lopez testified that she never even considered whether Plaintiff faced an emergency. Lee Decl. ¶ 4, Ex. C at 130:10–135:8. TAS' wrongdoing thus lies not in the adoption of a policy, but in its managing agents' deliberate decision to wield that policy against a safety report. TAS' institutional responsibility is direct, not derivative, and it supports a higher degree of reprehensibility than in *Roby*.

*Roby*'s other distinctions fail as well. Unlike the conscious disregard TAS describes in *Roby*, Ms. Lopez's far-fetched explanations and the jury's rejection of TAS' same-decision defense support a finding that TAS knew Plaintiff was reporting a dangerous situation and fired him for it. Furthermore, because TAS' conduct implicated physical safety, which *Roby* did not, Plaintiff's financial vulnerability carries greater weight here.

Finally, TAS' own authorities permit ratios above one to one: four to one in *Nikmanesh*, a section 1102.5 retaliation case; six to one in *Gober*; and 1.5 to one in *Colucci*, despite low-to-moderate reprehensibility. *Nikmanesh v. Wal-Mart Stores,*

*Inc.*, No. SACV 15-202 JGB (JCGx), 2022 WL 1837515, at *11 (C.D. Cal. Feb. 25, 2022); *Gober v. Ralphs Grocery Co.*, 137 Cal. App. 4th 204, 222–223 (2006); *Colucci*, 48 Cal. App. 5th 442, 457–458. *Samson* likewise permitted a 1.5-to-one ratio for low-to-moderate retaliation. *Samson v. Wells Fargo Bank*, N.A., 2022 WL 23090556, at *3, *6 (C.D. Cal. Dec. 16, 2022). Here, the jury found malice, oppression, or fraud in retaliation against a safety report. If the Court were nonetheless inclined to find the award excessive, Plaintiff requests that it identify the maximum permissible amount based on the full compensatory award and allow Plaintiff to elect between that amount and a new trial on punitive damages.

### D. The Court Should Not Strike the Jury's Economic Damages Award

#### 1. TAS Is Relitigating Its Denied Motion in Limine and Never Made the Trial Objections the Court Required

TAS' request to strike the $210,080 lost-earnings award under Rule 37(c)(1) is a second attempt at its Motion in Limine No. 2. The Court denied that motion as overbroad, explaining that it must determine whether each piece of undisclosed information was substantially justified or harmless and could not make that determination preemptively. Dkt. 102 at 10–11. The Court specifically noted that Plaintiff had disclosed his hourly rate, lost wages, lost benefits, and loss of future earning capacity, and held that TAS' request was "better suited to objecting at trial to specific pieces of evidence" so the Court could decide individually whether any failure to disclose was substantially justified or harmless. *Id.* The Court denied the motion without prejudice to TAS objecting to specific evidence at trial. *Id.* at 11.

TAS' motion does not identify any trial objection under Rule 37(c)(1) to Plaintiff's wage testimony, and it does not contend that the Court erred by overruling such an objection. The only trial ruling TAS cites concerns a single cross-examination question about notary documentation. TAS states that the Court sustained Plaintiff's objection to a question asking whether Plaintiff had provided

documentation of his notary earnings. Having bypassed the procedure the Court prescribed, TAS cannot now ask the Court to make, after the verdict and on a wholesale basis, the very exclusion ruling the Court declined to make before trial. Rule 59(e) does not exist to give a party a post-verdict substitute for objections it did not make.

**2. Plaintiff Disclosed Every Input Used to Calculate His Lost Earnings**

TAS' premise, that Plaintiff never disclosed how he calculated his wage loss, is false. Plaintiff disclosed every figure that went into the calculation. In his supplemental interrogatory responses, Plaintiff disclosed that he was terminated on or about January 18, 2024, that he was earning approximately $33.00 per hour as a non-exempt hourly employee, that he suffered lost wages, lost benefits, and loss of future earning capacity, and that he began performing independent notary work. Dkt. 61-10 at 7.[2] He estimated his notary income at approximately $15,000 in 2024 and approximately $40,000 in 2025, and stated that this mitigation income was substantially less than the wages he would have earned at TAS. *Id*. at 7–8. On March 12, 2026, Plaintiff's counsel confirmed in writing that Plaintiff had produced everything, that the notary figures were calculated by tallying his post-termination notary jobs, that no 1099s existed because the jobs did not reach the $600 threshold, and that no additional records existed. Dkt. 61-14 at 2.

The lost-earnings calculation presented at trial used exactly those disclosed figures. As TAS acknowledges, counsel calculated in closing a $28,640 annual loss,

---

[2] Plaintiff's interrogatory responses stated that he was terminated "on or about January 18, 2024." (Dkt. 61-10 at 5, 7.) The parties later stipulated that TAS terminated Plaintiff's employment effective January 16, 2024. (Dkt. 103 ¶ 23.) The "on or about" date was an approximation given in discovery, and TAS, which issued the termination, always had the precise date. The two-day difference does not affect any input to the lost-earnings calculation Plaintiff disclosed and presented at trial, and TAS does not contend otherwise.

requested approximately $71,600 in past lost earnings, and proposed the same annual figure for whatever future years the jury selected. See Dkt. 214-1 at 28. That annual figure is simple arithmetic from the disclosed inputs: the $33 hourly rate over a full-time year, less the disclosed $40,000 in annual notary income. TAS needed no expert, no additional records, and no further discovery to perform that calculation. Indeed, TAS performed its own lost-wage calculation at the outset of the case. TAS' own Notice of Removal calculated the amount in controversy using at least $86,400 in lost wages, and Plaintiff's initial disclosures and the Rule 26(f) report identified that same damages framework. Dkt. 1 ¶¶ 34–37 & n.1; Dkt. 80 at 4–5.

**3. Any Disclosure Deficiency Was Harmless**

Rule 37(c)(1) does not permit exclusion where a failure to disclose was substantially justified or harmless, and the rule expressly permits alternatives to exclusion. Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). In assessing harmlessness, the Ninth Circuit considers prejudice or surprise, the ability to cure, the likelihood of trial disruption, and bad faith or willfulness. *Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1192 (9th Cir. 2022). Where a sanction amounts to dismissal of a claim, the court must also consider willfulness, fault, or bad faith and the availability of lesser sanctions. *Id.* Eliminating the entire economic-damages award after a jury verdict is the functional equivalent of dismissing that portion of Plaintiff's claim.

Every factor favors Plaintiff. There was no surprise: TAS knew Plaintiff's termination date, hourly rate, damages categories, mitigation work, and mitigation income during discovery, and it calculated its own lost-wage estimate before discovery began. Any perceived deficiency was curable: TAS never filed a motion to compel further responses, even though the Court's Civil Trial Order required any such motion to be filed and heard before the discovery cutoff. There was no trial disruption. TAS cross-examined Plaintiff about his notary income, his work plans,

and his job search. See Lee Decl. ¶ 3, Ex. B at 68:1–75:21. TAS' own motion recounts that it cross-examined Plaintiff about his expected work life, impeached him with his deposition testimony, and read that testimony to the jury. The jury then weighed that evidence and awarded a measured amount. There was no bad faith. Plaintiff explained in writing why records such as 1099s did not exist and confirmed that he had produced everything in his possession. TAS' response that it needed no order compelling disclosure before seeking exclusion misses the point. Plaintiff does not contend that a motion to compel is a precondition to exclusion; the ability to cure is one of the factors that governs harmlessness, and TAS' decision not to seek further responses when it could have done so confirms that any gap was curable. Likewise, TAS' argument that Plaintiff's trial and deposition testimony about his work plans differed goes to credibility, which TAS tested through impeachment before the jury.

*Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175 (9th Cir. 2008), on which TAS relies, is inapposite. TAS characterizes *Hoffman* as affirming exclusion where the plaintiffs failed to disclose damage computations. Here, by contrast, Plaintiff disclosed each input of a straightforward wage-loss calculation, TAS performed its own version of that calculation in its Notice of Removal, and the Court declined before trial to exclude the evidence, instead directing TAS to raise specific objections at trial. TAS' complaint is ultimately about the weight of Plaintiff's testimony regarding his notary income and future work life. TAS made those arguments to the jury, and the jury resolved them. That resolution is not a manifest error of law or fact.

## V. <u>CONCLUSION</u>

TAS' motion asks the Court to substitute its judgment for that of a unanimous jury on every disputed damages question. Rule 59(e) does not permit that result. Plaintiff respectfully requests that the Court deny TAS' Motion to Alter or Amend the Judgment in its entirety. In the alternative, should the Court find any portion of

the punitive award excessive, Plaintiff requests that the Court calculate any reduction based on the full compensatory award and permit Plaintiff to elect between the reduced amount and a new trial on punitive damages.

DATED: November 25, 2026

DIVERSITY LAW GROUP, P.C.
LAW OFFICE OF RENIA ZADOURIAN

By: *\/s\/ Larry W. Lee*
Larry W. Lee
Kwanporn "Mai" Tulyathan
Kym Kanenaka
Attorneys for Plaintiff Daniel Stein